Okay, counsel, you may proceed. Thank you, your honors. And may it please the court, my name is Chris Mattel for Portfolio Recovery Associates. I'll refer to them as PRA today for just shorthand, would be happy to. Sorry, your honor. The page 11 of the September 14, 2011 order from Judge Battaglia where he reversed himself from the June 23rd order reads on excerpt directed to page 16, This is a case in which an injunction is expressly authorized by statute. Generally, a party seeking a preliminary injunction must meet the standard requirements for equitable relief. However, the Ninth Circuit has not required a showing of irreparable harm when an injunction is sought to prevent the violation of a federal statute or that statute specifically provides for injunctive relief. That is not the law. That is a 100% wrong law after 2008 with the Winter decision from the Supreme Court where it reversed this court with respect to the NEPA statute saying that you cannot presume injunctive relief under statute. In fact, this court has exactly held just that. There's a district court case that was appealed. It's referred to Enyart v. National Conference of Bar Examiners where the district court said to the extent prior Ninth Circuit case law concluded that irreparable harm need not be shown in certain statutory context, that case law is in conflict with Winter. That case was then appealed to this court. Enyart at 630 F. 3rd at 1165 noted that the district court got the law right and because the district court got the law right, this court should not reverse unless the district court clearly erred in its factual determinations. Let me just ask you a question that bothers me. Why are damages an adequate remedy here? It seems to me it would be giving a license just to continue violating it as a cost, violating the TCPA as a cost of doing business. The cost of doing business, Your Honor, in this certain statutory context is quite high. I mean, it's $500 per phone call, first of all. So the adequate remedy, you know, frankly, I would love it if somebody started calling my cell phone three times a day without authorization if I could get $1,500 a day. So that isn't certainly an adequate remedy at law, and that's exactly what the plaintiff here is seeking. The plaintiff here, if you look at the actual record, received three telephone calls from PRA pursuant to a debt that he didn't pay for a total of less than four minutes. But that's not a determination we make. That's the – this is – these are penalties prescribed by Congress. Fair. What the point is, though, Judge Christian, is that in this record, Judge Battaglia made zero finding of irreparable injury with respect to the September 14 order. But he did make a finding of the absence of irreparable injury on June 23. Right. So the only thing that really remains up here today is that there's a finding of no irreparable injury. That is the only thing that remains. That's the only – Well, there's the legal issue of whether or not it's necessary to make the finding, right? That's true. But in addition to the Enyart case, you have the Park Village Apartment Tenants Association case, 636F3rd, and I'm reading from page 1162, 9th Circuit, 2011. Under our case-specific approach, we do not presume irreparable harm simply because a defendant violates a statute that authorizes injunctive relief. And that's exactly what happened here. But again, the only finding that is out there right now about irreparable injury is that it doesn't exist. So I think on that basis, what we would ask Your Honors to do is remand this case with instructions to deny the motion, because that's the only finding that remains right now, and that has not been appealed because they withdrew their notice of appeal. Our second argument goes to the likelihood of success on the merits. The touchstone of finding liability under the Telephone Consumer Protection Act, the TCPA, is finding this ATDS, or an automatic telephone dialing system. You have to find an ATDS before there can be any TCPA violation. Sorry for all the letters. If you look at page 10 of the September 14 order, Judge Battaglia made no finding that PRA possesses an ATDS. In fact, all he did was he cited the complaint of Mr. Meyer, and he noted that even that allegation was on information and belief. So in this case, where he's repeatedly being told that we were blatantly violating the statute, you can't blatantly violate a statute unless you have an ATDS, and we presented evidence to the court that we do not have an ATDS. We actually, I'm sorry, Your Honor, go ahead. Well, I'm interrupting you, forgive me, but what do we do with the FCC rulings that say that a predictive dialer is an ATDS, and your SEC filings that say you've got a predictive dialer? Thank you. It's my job. I don't know if you're reading my outline, but thank you. Two things on that. The first thing is that if you read subsection B of the TCPA, and this has never been addressed by any court, but if you read that, the rulemaking authority of the FCC in order to define terms is limited to that subsection. That's in your brief. Subsection A is where the ATDS is, so that's number one. So your first argument is you think the FCC didn't have the authority to make that? They had no authority whatsoever to define that term, and therefore, you have no reason to look at it. But second of all, with respect to Chevron deference, we only look to the FCC's interpretation of a statute under Chevron deference, number one, if it's ambiguous. This issue has already been resolved by one court, this court, in the Satterfield decision. In Satterfield, well, bear with me. I'm listening. In Satterfield, if you look at the definition of ATDS, they specifically said we only look to the FCC under Chevron deference if it's unambiguous. And with ATDS, there was no looking to the FCC order with respect to the ATDS. But with respect to the ---- In Satterfield. In Satterfield. But with respect to the definition of call, then this Court did give Chevron deference, said that it was ambiguous, and then did look to the FCC. That's because that was an undefined term, right? And your point is that we have a defined term. But tell me why the term is inherently unambiguous. Well, it says ---- it's pretty easy. It says equipment that has the capacity to store or produce numbers that can be dialed randomly or sequentially. That's under A1. Yes, counsel, but the FCC ruling came down because another litigant was seeking clarification about what that definition meant, right? I understand. That litigant was not PRA, and we do not think that it was ambiguous. They might think it's ambiguous. We do not because, again, and no court has looked at this issue specifically, and I don't know if we really fully said this in our briefs. But if you look at A1, the definition of ATDS, it says equipment that has the capacity, present tense, has the capacity. If you look at subsection C1b of the statute, this talks about FCC rulemaking authority with respect to methods and practices. And in that C1b, and I'll quote it here, they are instructing the FCC to evaluate the categories of public and private entities that would have the capacity to establish and administer such methods and procedures. Future tense. PRA right now does not have the capacity to dial numbers randomly or sequentially. Their dialers can't do it. We've submitted a sworn declaration from that. It has not been contradicted at all in this record. Your dialers would have to be modified according to the declaration. They would have the capacity if they were modified. This specific statute makes a distinction between present tense and future tense within the statute itself. You have to give, you know, understand that Congress is doing this for a reason. But that's what Satterfield did go to. Satterfield talked about the importance being whether or not the equipment has the capacity to. It does. It does. And that's what this case is about. And that's where we don't have a finding that we do have equipment that has this capacity. All we have is a citation to an allegation on information and belief. That's it. And this, again, was done after Judge Battaglia reversed himself. So with respect to those two issues, I mean, if we're talking about. Tell me what the steps that would have to be taken to your equipment to activate its latent capacity. It would take about a month of computer programming time and a modification of the contract with Avaya, which owns the dialer. If we did what the plaintiffs are saying that we have the capacity to do, we would be in breach of contract. So you're saying that as a matter of fact, although you have the potential capacity, there are barriers to your enabling it. Correct. And therefore, the rule doesn't reach you. Correct. And may I use an analogy, Your Honor? This room has the capacity of about 100 people. But if you knock out that wall and you knock out that wall and you extend it, over all of Pasadena, it could contain about 200,000 people. Does that mean that this room has the capacity for 200,000 people? It just needs to be modified. I think we'll take your hypothetical. That's a slippery slope. It is. It is. But that's why this has the capacity and would have the capacity, which is in the statute itself is so important. Because if you look at the present tense as to how you're using it, because, Your Honor, you're using an iPad, that can be connected to a telephone line. Even if you do it over the Internet, if you put in a microphone into it, you can make calls over that. That's right. It has the capacity. And I might have to take steps to make it happen, but it certainly has the capacity. And with that capacity, if we wanted to ban any Internet connections in this courtroom, even if they're not enabled, we could tell them not to do it, and we could enforce that rule. Could we not? It would have the capacity if it was modified. Oh, absolutely you could. Yes, because it could be modified. It just happens to be simple steps, perhaps.  Well, those are. . . So much for analogies. That would be. . . It would have stayed with the punching at the walls. Walls are better. What I'm saying is that it does not presently have that capacity. Well, that might be modified. No, it does have the capacity. It has the capacity because one could. . . You know, I could go in the next room, put in a software program, and I could turn this into a video conferencing device. Then does this room have the capacity for 500 people? Well, maybe not. But, you know, then we're talking about a really major reconstruction. But before we remodel the courthouse, and you just have a few minutes left, so could I ask a question about are you going to speak to class certification? Yes. Judge Battaglia conflated the issue of consent to skip tracing. We have a number of contracts. PRI buys dozens of contracts from debtors, credit card companies, and that sort of thing. There are dozens of contracts that are out there that specifically say that we can call you on any number that we want. We provided the Washington Mutual one to the court below. Well, you provided an exemplar, and I don't understand this part of your argument because I think what is your response to a plaintiff's argument, Appleby's argument, that you didn't give one example of where you're trying to collect a debt owed by somebody who had given permission to the creditor? Did I miss it? No, you did not. And getting these contracts from the specific debtors where you buy these debt is not ñ it's a morass, and it's very difficult. And we have produced all these to the plaintiffs since that time, and we would like the opportunity to go back now that we've got all these different versions from these banks to get them. It's not ñ I can see from your honor, you know, look at me, believe me, we have tried since day one in order to try to get all these contracts together so we can get all of them and get affidavits saying these are the ones that all pertain to debt. But what really happens in this industry is that you buy essentially a whole bunch of debt with people's names and the amount of money that they owe, and it's very rare that you actually go back and have to litigate the terms of the contracts. Well, setting aside the litigation, is there something in the record, did the trial court know, how those debts get transferred to you, what comes with the information other than the debtor's name and the amount? The ñ The contact information for the debtor? Mr. Stern's declaration attacks that to it, and said that the contract in there did have provisions in there that provided for consent. Did I not answer your question, Judge Christin? I'm not sure you did, but maybe I didn't ask it very well. I'm trying to figure out as a matter of course whether or not there's information in the record that PRA received contact information from the individual debtors. In certain circumstances when we get that transferred over, yes, it is. That's in the record? Probably not. I'm looking at my colleague. Probably not, Your Honor. I don't know that for certain. Thank you. I have just one question about consent. Doesn't PRA's use of skip tracing to obtain the cell phone numbers demonstrate the absence of consent? No, Your Honor, just for the reason that I was just discussing. There are contracts that a number of credit card companies have with debtors that say that we can call you on whatever phone that you have at any time. And these contracts are obviously different from Capital One to Washington Mutual to Bank of America, et cetera. But a lot of times when you sign up for a credit card at the front end, you are telling the credit card company they can call you on whatever phone that you have, whether you have it now or in the future. In this case, with Mr. Meyer as a convicted felon, it's a good example where he can't remember all the aliases he's used. We're not ever going to be able to really discover whether or not he signed one of those contracts and whether or not he provided that consent because he's used so many different names that he can't even remember. I think my time's just about up. Your Honors, may it please the Court, my name is Ethan Preston. I'm here representing Plaintiff Appellee Jesse Meyer. There's four themes that emerge in Mr. Mattel's presentation. The first is irreparable harm. The absence or presence of irreparable harm, nobody has a clear definition of what irreparable harm is. I think you cannot define irreparable harm without at least looking to the statute. And if a statute provides injunctive relief, I think you have to go ahead and assume that the statute protects an interest which is capable of being irreparably harmed. In this case, the purpose and goal of the TCPA was to protect against invasions of privacy. And that's what happened here on a massive, massive scale. The statute also provides for statutory damages because it can be difficult to calculate damages, but also we want to deter this conduct from happening. It's not a compensatory damages scheme. We're not making things right. We're deterring it so it doesn't happen ever. And in this case, they're not deterred by statutory damages. Counsel, I think opposing counsel's argument is that the trial court didn't make a finding of irreparable harm. And you're trying to convince me that there was irreparable harm, whether there's a... I think Your Honor can affirm on any grounds that are in the record. And I think there's absolutely plenty of evidence of irreparable harm. Okay. So my question is, to be more focused if I could, please. Do you have any more recent authority than opposing counsel offered for the proposition that post-winter were permitted to affirm an injunction where there's no irreparable harm finding? I forget the exact procedural posture of Antonetti v. Chipotle, but that was a case in which this court applied those old statutes, the older cases, pre-winter cases, and said, look, this has a continuing vitality. Once you're violating a statute that has an injunctive right of action and it's clear, then you know pretty much that there's irreparable harm. I actually think the case that makes the most sense to me is the designer skins versus S&L vitamins. And it's an unpublished decision from the District of Arizona, but it's very simple. Was it cited in your brief? Yes, it was. Yes, it was. Past infringement plus the threat of future infringement equals irreparable harm. There's no presumption of irreparable harm. We don't need a presumption of irreparable harm. We know that after we brought a class action saying, guys, you're looking at $500 a call, they continued to call California residents, you know, 40,000 different residents. They're not deterred by the statutory damages. And if the point of the statute is to safeguard the privacy of cell phone users, then the statutory damages have not fulfilled their statutory purpose, and we need to go on to the injunctive relief. Before you go on to injunctive relief, could I ask you to address class certification and the commonality argument that opposing counsel raised? Sure. First off, I'm not sure that that's properly before the court. It wasn't raised in the opening brief, but that's a procedural sidestep that I'm sure Your Honor doesn't want me to rest my hat on. In 2008, the FCC issued its decision defining what consent is in the debt collection context. Consent is only given where the debtor provides the number to the original creditor and that number is provided during the transaction when the debt emerges from. That's the law. But I'm asking you to address this in the context of the class certification where you have the burden of proof to show consent. I don't have the burden of proof. I do not have the burden to show consent. Your position is that you don't have the burden? I do not have the burden to show consent. Are you familiar with the Gene and Gene case out of the Fifth Circuit? I'm familiar with that case, but that's a facts, a junk fact case. You don't have the FCC ruling that defines what consent is. We know what consent is in this case because consent can only be given through the original creditor at the time of the transaction. If you're skip tracing, you don't have consent. Well, Gene and Gene, I'm not sure you're, or maybe I'm not following your response, but Gene and Gene came down after the FCC ruling that you're speaking of? Gene and Gene is a junk facts case. And what I mean by that is it arises under different provisions of the TCPA. It does not contain, the 2008 FCC ruling is not applicable to the claim, the ad issue in Gene and Gene because it's about facts. It's not about debt collection agencies calling consumers. I've read it. I understand that. Okay. So the distinction I'm trying to get you to focus on is in the context of the preliminary injunction, before we get to probability of success on the merits, right, but in the context, forgive me, I misspoke, of the class certification, it sounds like your position is you think you don't have the burden of proof to show the common question. I think I have a burden of proof to show a common question, but I think they have the burden of proof to show consent. And that's the common question is, you know, is there consent? That's common. And we all know what that question is. It's on them to show that that consent exists. Their notion that, you know, getting the contracts is difficult, and that's why we couldn't show that people had actually signed these contracts, which is, you know, again, as Your Honor noted, it's nowhere in the record that any actual class member actually signed one of these contracts. There's no evidence of that. Well, that's on their burden of proof. I don't have to show that. In the context of the class certification, that's your position? I believe that's right, Your Honor. I don't think that we have to show consent. I think we have to show that consent is a common question, but I don't think we then have to go the next step and show, oh, there was no consent. That's, you know, the burden of proof is we have to show that there was. Well, let me put it a different way then. Okay. If the consent was, or forgive me, the information was, contact information was obtained versus skip tracing from a bunch of different sources, unlike some of the cases that we've read where it came from one list, and I'm understanding it's uncontested that PRA obtained these phone numbers from skip tracing, then how is that common question going to be capable of class-wide determination rather than an individualized basis? Because none of those, none of the skip tracing is effective consent. The only way they can show effective consent is by producing a number from the original creditor. I don't think I'm answering your question. Because he obtained my phone number from somebody other than me, the cell phone number owner. Right. Or from you, the creditor. Right. Doesn't mean I didn't give you consent, does it? It very much depends. Do you mean, okay, let's do a hypothetical. I owe a debt. I've given my number to the creditor. The creditor sells the number to a debt collector. Okay. If the creditor, if I change my number and the creditor or the debt collector calls me on my new number, that's a TCPA violation and it doesn't matter what's in the contract between me and the original creditor, at least under the FCC's ruling. If I give my number to the original creditor, the debt collector skip traces that number, unbeknownst to them that the original number was given to the original creditor, that maybe they have effective consent, but then they need to prove that. All right. So the trial court's ruling was that by virtue of the fact that the PRA obtained these phone numbers from skip tracing, not from the cell phone owner and not from the creditor, therefore necessarily this consent had not been given. Isn't that faulty reasoning? I don't think so in the context that the court was ruling, and this is why. This is why the burden of proof matters, because they had an obligation to come up and show, yeah, we skip traced these numbers, but we had consent to call them all along, and they never did that. In the context of the preliminary injunction where they have to show likelihood of success on the merits, that's an issue the FCC has said they have the burden of proof. I'm asking you about class certification where you have the burden of proof. Consent is a merits issue. I have to show that consent is a common issue on class certification. Right. But it's also the common question is can they produce any evidence. It's not, you know, is can we produce any evidence. The burden of proof is on them. Class certification is just a procedural device. It does not shift the burden of substantive proof. The merits of this case, consent is a merits issue, and consent falls on them. I think you've answered my question. Thank you, Your Honor. Thank you. Would you address the modification of the walls of the courtroom or my iPad question? I won't pretend that I follow it all the way down the train or track, but look, capacity means that there's some modification that can take place. It's not about the present use of the device. It's not about how it's presently configured. If we take the word capacity seriously, it's there's some degree of modification that can occur. The question is how much modification. And they seem, they're kind of clawing at, there's got to be some line there where we can have ourselves on the safe side of that line. The problem is that this specific technology has been identified by the FCC, the predictive dialers. There's no real controversy that they were using predictive dialers and there's no real controversy that the FCC. Does Your Honor disagree? No. You shook your head. If I twitched, I twitched. I'm sorry. The stakes are high. She really got you intimidated. I'm going to be really still. Well, I don't mean to suppress your self-expression in any way. It might be a First Amendment claim, but go ahead. We don't have to approach that question today, because we have an FCC ruling that says, look, this specific technology, where you're making calls without human intervention, and it's a predictive dialer. That's an ATDS. And that's sort of the end of the case. They're saying, look, you don't have to follow the FCC rulings. They have not addressed the Hobbs Act, and the Hobbs Act, as this Court has said, there's only jurisdiction to review an FCC order on an original appellate case. We're not here on an original appellate case to review the FCC's orders. Do Your Honors have any more questions for me? Let me just ask about Mr. Myers, his criminal record. Does this give problems precluding a finding of adequacy? No, Your Honor. And why not? Well, to start with, the law is very clear that criminal convictions do not preclude adequacy. If they did, class litigation over prisoners' rights would be impossible in this country. You couldn't litigate prisoners' rights, because every single person in those jails or in those prisons has been convicted of some crime, probably most of them, correctly so. So it's consigned to the sound discretion of the Court. The Court did, in fact, consider their arguments. It repeated their arguments verbatim in its decision and decided, I don't have a problem with this individual. Mr. Myers' convictions are now eight years past. I'm rather he's, I think, stopped. I understand your answer. They did not argue it today, but I was just curious about your response. And it's adequate. Thank you. Thank you, Your Honor. Thank you. I think I have six seconds left, and there's just one case that I would just like Your Honors to look at with respect to the Notice of Appeal divesting the Court of Jurisdiction, the Ninth Circuit case of Small v. Operative Plasters and Cement Masons International, 611F3rd at page 495, 611F3rd at page 495, that this Court told the district court that it couldn't modify a preliminary injunction after a Notice of Appeal was pending. Did you cite that in your brief? No, we did not. Would you submit a gum sheet to the opposing side, and you may get it from the clerk. Yep. We have a procedure called 28J letters. You're familiar with those? I am, Your Honor. And I just, frankly, I found this case yesterday as I was preparing for my argument, and I apologize to the Court. On your iPad using Westlaw. Or a modified version. On my Sony Vio using Lexus, but yes. Can I address the judge? I'm sorry? Can I address the judge? It's in the briefs, Counsel. It's fine. All right. The case argued is submitted. You can't argue the case. All right. The next case on calendar is Lena v. Barnes & Noble.
judges: Nelson, Fisher, Christen